UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MENLO LOGISTICS, INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>WESTERN EXPRESS, INC.,<br><br>        Defendant.<br>_____/ | No. C-04-4684 JCS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION [Docket No. 39]** |

## I.     INTRODUCTION

This case involves a load of goods that was stolen when a driver for Western Express, Inc. ("Western Express") left the truck carrying the goods running and unattended at a truck stop. Plaintiff Menlo Logistics, Inc. ("Menlo") had arranged for transport of the goods, which were to be taken by Western Express from one Hewlett-Packard ("HP") facility to another. Menlo paid a claim filed by HP in the amount of $336,932.02 and now seeks to recover that amount from Western Express. Plaintiff has filed a Motion for Summary Judgment, or in the Alternative, Summary Adjudication ("the Motion"), which was heard on Friday, September 16, 2005, at 1:30 p.m.[1] For the reasons stated below, the Motion is DENIED.

---

[1]  This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), based on the consent of the parties.

## II. BACKGROUND

### A. Facts[2]

Menlo is a broker for motor carrier transportation. First Amended Complaint("FAC"), ¶ 4. On April 16, 1999, Menlo entered into a contract with Western Express entitled "Master Broker/Motor Carrier Agreement" ("the Master Agreement"). Declaration of Joseph W. Schuler in Support of Plaintiff's Motion for Summary Judgment or Summary Adjudication ("Schuler Decl.").[3] On May 8, 2002, Menlo and Western Express entered into an addendum to the Master Agreement entitled "HP Addendum to Master Broker/Motor Carrier Agreement (TL)" ("the Addendum"). Schuler Decl., Ex. 2. Pursuant to these agreements, Western Express agreed to provide transportation services to Menlo's customers.

On Friday, February 13, 2004, Western Express driver Jerrick Douglas was scheduled to pick up a shipment of goods from one of Menlo's customers, HP, at a facility in Mt. Juliet, Tennessee and deliver the shipment to another HP facility, in Indianapolis. *See* Amended Declaration of Clarence Easterday in Support of Opposition to Plaintiff's Motion for Summary Judgment ("Easterday Amended Decl."), ¶¶ 3-4. The driver arrived at the Mt. Juliet facility after his scheduled pick-up time because, on the way to the Mt. Juliet facility, his truck got stuck when he pulled off the road to check his directions, and he had to wait for a tow-truck to pull him out. *See* Declaration of Amy L. Kashiwabara in Support of Plaintiff's Motion for Summary Judgment or Summary Adjudication ("Kashiwabara Decl."), Ex. A (Driver's Statement) at 1. Having picked up the shipment, the driver drove directly to HP's Indianapolis facility, arriving at around between 9 and 10 p.m the same night. *Id*. at 1, *see also* Declaration of Chris Zook in Support of Plaintiff's Motion for Summary Judgment or Summary Adjudication ("Zook Decl."), ¶ 8. When he arrived, however, he was told by employees at the Indianapolis HP facility that he could not unload his truck at that time. Kashiwabara Decl., Ex. A at 2. The driver remained at the Indianapolis HP facility overnight and again requested to unload the shipment on Saturday morning but was told that the delivery would have to be rescheduled. *Id*. at 3. According to the driver, when he asked whether he could either leave the trailer at

---

[2] Unless otherwise indicated, the Court relies on facts that it finds to be undisputed. Except where expressly noted below, the Court does not reach the parties' evidentiary objections.

[3] As discussed below, the Court overrules Western Express's objection that this document is not properly authenticated.

2

the HP Indianapolis facility or park the truck there until Monday, HP employees denied his requests. *Id*. At that point, the driver left HP's Indianapolis facility and went to the Flying J Truck Stop, where he was instructed by Western Express to wait until Monday morning, when he was rescheduled to deliver the goods. *Id*.

On Sunday, February 15, at around 9:30 p.m., the driver went into the truck stop, leaving his truck running and unattended. Kashiwabara Decl., Ex. A at 4-5. The evidence is mixed as to whether or not the truck was locked at the time. *See* Zook Decl., ¶ 12 (stating that driver told Zook in course of interview that he left the driver side door unlocked); *but see* Declaration of Jerrick Douglas in Support of Opposition to Plaintiff's Summary Judgment Motion ("Douglas Decl."), ¶ 6 (stating that although he had told investigators that he may have left the door unlocked, he "believe[d] that . . . the doors were locked."). When the driver came out of the truck stop, the truck had been stolen. Kashiwabara Decl., Ex. A at 5.

On February 25, 2004, HP filed a damage claim with Menlo for $336,932.02 for the stolen goods. Schuler Decl., ¶ 9 & Ex. 3. Menlo, in turn, filed a claims invoice with Western Express for the same amount. *Id*., ¶ 10 & Ex. 4. Western Express refused to pay the claim, however, explaining its reasons in a letter dated June 8, 2004, which states, in part, as follows:

> Unfortunately, our cargo insurance carrier, AIG Technical Services, Inc., has denied coverage . . . "due to a violation of warranty provisions . . . ." It is Western Express, Inc[.'s] position that this denial is wrongful and borders on bad faith. Although [ ] this dispute is between Western Express and AIG, it does indirectly affect our ability to conclude this claim with Menlo Worldwide Claims. Simply stated, Western Express, Inc[.] is not prepared to settle this claim without the assistance of insurance funds.

Kashiwabara Decl., Ex. B (June 8, 2004 Letter from Western Express to Menlo).

**B.   Procedural History**

Menlo filed this action on November 4, 2004, asserting a claim for breach of contract. On May 24, 2005, Menlo filed an amended complaint adding a claim for negligence. Menlo now brings a summary judgment motion, asserting it is entitled to summary judgment on both its breach of contract claim and its negligence claim.

Menlo advances three breach of contract theories under which it asserts it is entitled to summary judgment. First, Menlo asserts that provisions in the Addendum and Master Agreement make clear that Western Express took responsibility for losses that occur prior to delivery of the goods where Western

3

Express retains control of the goods. Specifically, Menlo cites to Sections 5.0(B) and 6.0(B)(i) of the Addendum and Section 6 of the Master Agreement. Section 5.0(B) provides that Western Express "shall be liable to Menlo and HP for loss, damage or injury to HP Products from the time such products are transferred to [Western Express] until [Western Express] delivers such products to their final destination." Schuler Decl., Ex. 2 at 2. Section 6.0 provides, in part, that "where [Western Express] cannot provide proof of delivery to Menlo or where such proof of delivery indicates a shipment has a loss or shortage, Carrier shall reimburse Menlo in accordance with paragraph 5.0(b) above." Section 6 of the Master Agreement provides that "[Western Express], in performing freight transportation services pursuant to this Agreement, shall be liable to Menlo, any involved shipper, and any involved customer of such Shipper, for the full value of any loss, damage or injury to property occurring while in the possession of [Western Express] or under [Western Express's] care, custody or control . . . ." *Id*., Ex. 1 at 5. According to Menlo, the undisputed evidence shows that Western Express breached these provisions when it refused to cover Menlo's losses with respect to the stolen goods.

In making this argument, Menlo rejects Western Express's anticipated argument that by arriving at HP ready to unload the goods, the goods were "delivered" for the purposes of Section 5.0(B) of the Addendum. Menlo points to Section 7.0(A)(iii) of the Addendum, which provides that:

> Upon delivery, seal number and piece count must be verified by the consignee and driver and indicated in writing on the bill of lading as intact before opening the trailer. Piece count should be confirmed by consignee and driver and indicated in writing on the bill of lading.

Schuler Decl., Ex. 2 at 5. According to Menlo, because a piece count was not performed, there was no delivery. Menlo also argues that an exception in Section 5.0(B) for losses resulting from the "sole negligence" or "willful misconduct" of Menlo and/or HP ("the Sole Negligence Exception") does not apply. According to Menlo, because the Western Express driver admitted that he left the truck running, unattended and unlocked – and therefore was negligent as a matter of law – the loss could not have resulted from the *sole* negligence of HP.

Second, Menlo invokes Section 16 of the Master Agreement, regarding indemnification ("the Indemnification Clause"). Section 16 provides, in part, as follows:

> Except as otherwise provided below, [Western Express] agrees that it will protect, defend, hold harmless and indemnify Menlo, Shipper, customers of Shipper and their respective directors, officers, employees, and agents (hereinafter collectively referred to as "Indemnitee") from and against: . . .
> d) Any and all other claims made by or on behalf of a Shipper or its customers against any other Indemnitee, if such claim arises from services rendered by Carrier, Carrier's agents or subcontractors under this Agreement.

Schuler Decl., Ex. 1 at 9. Menlo asserts that given the undisputed evidence that it paid HP's claim, it is, as a matter of law, entitled to indemnification under Section 16.

Third, Menlo asserts that the undisputed evidence shows that Western Express breached Paragraph 5 of the Master Agreement. That section requires that Western Express maintain at least $1 million dollars in cargo liability insurance coverage, with Menlo as an additional insured, and that the policy "contain a severability of interest provision in favor of Menlo or a full and complete breach of warranty endorsement to the effect that the insurance coverage will not be invalidated as regards the interest of Menlo by any act, failure to act, or neglect of [Western Express] which is in violation of the terms and conditions of such insurance." Schuler Decl., Ex. 1 at 4.

Menlo further argues that it is entitled to summary judgment with respect to its negligence claim, for the same reason the Sole Negligence Exception of the Addendum does not apply. In particular, it cites to California cases holding that it is, as a matter of law, negligent when a driver for a carrier leaves a truck running, unattended and unlocked and the truck is stolen. Menlo relies on the undisputed fact that the driver left the truck running and unattended and on statements by the driver made in the course of investigation that he left the truck unlocked.

In its Opposition, Western Express disputes the authenticity of the Master Agreement and argues further that its contractual obligations were satisfied because it tendered delivery of the goods and the tender was rejected. In support of this assertion, Western Express relies on the common law governing the duties of common carriers, as well as Menlo's standard bill of lading, which states that when the consignee refuses delivery, a carrier becomes a warehouseman. *See* Declaration of Isham B. Bradley Supporting

Opposition to Plaintiff's Motion for Summary Judgment ("Bradley Decl."), Ex. F (Bill of Lading).[4] Western Express goes on to look to Indiana law – which it asserts governs Menlo's negligence claim – regarding the duties of a warehouseman, otherwise known as a bailee. According to Western Express, because the standard of care for bailees is low, under Indiana law, and because there is a dispute as to whether the truck was locked, summary judgment is not appropriate. On the question of whether the truck was locked, Western Express cites to Chris Zook's initial reports, which state the truck was locked. *See* Bradley Decl., Ex. A & D.[5] Further, Western Express asserts that the actions of the thief were a superseding cause of the loss. Even if this were not so, Western Express argues, because Indiana is a comparative fault state the jury must apportion fault between Western Express, HP and the thief.

With respect to the contract claim, Western Express asserts that it delivered the goods when its driver arrived at the Indianapolis HP facility and offered to transfer them to HP. Western Express rejects the assertion that Section 7.0(A)(iii) of the Addendum describes the procedures required to accomplish delivery, arguing that this provision "is merely a detail of a security procedure" and "has nothing to do with delivery." Western Express further asserts, invoking the Sole Negligence Exception of Section 5.0(B), that the loss was a result of HP's negligence in refusing to accept the delivery. Western Express's Vice-President, Clarence Easterday, states in his declaration that he spoke to Menlo's Chris Zook a few weeks after the theft, who told Easterday that the Indianapolis HP facility had had previous problems with theft and that the HP employees never should have allowed the driver to leave with a high value load. Easterday Amended Decl., ¶ 9. Easterday also stated that "Western Express had previously delivered loads to the HP Indianapolis facility which arrived late or at odd hours and the facility had always accepted the loads." *Id*., ¶ 4.

With respect to the insurance requirement in the Master Agreement, Western Express argues that Menlo waived it "by ordering transportation with the nature of the insurance coverage fully disclosed." Even if it was not waived, Western Express asserts, the provision cannot be enforced because no such

---

[4] The Court notes that the bill of lading provided by Western Express is not admissible because the Bradley Declaration is not under oath.

[5] As noted above, the documents attached to the Bradley Declaration are not admissible because the Bradley Declaration is not sworn under oath.

6

insurance is available in the market. In support of these assertions, Easterday states as follows in his declaration:

> I am familiar with insurance available to carriers on cargo policies and to the best of my knowledge, the type of insurance coverage required in paragraph 5(c) of the Menlo Master/Broker agreement is not available and cannot be purchased by carriers in the regular insurance market. Western Express did provide certificates of insurance to Menlo and Menlo did rely on the certificates provided to request Western Express to provide transportation services thereby waiving any additional insurance requirements.

Easterday Amended Decl., ¶ 12.

Finally, Western Express argues that with respect to both Menlo's contract and negligence claims, Menlo has not proven its damages. In particular, Western Express asserts that the amount paid to HP is not sufficient to establish contract damages and that Menlo must instead establish the amount in which Menlo was actually liable to HP under the contract between Menlo and HP. Alternatively, Western Express argues that damages on the negligence claim depend on "actual loss" under 49 U.S.C. § 14706.

In its Reply, Menlo rejects Western Express assertion that the goods were "delivered" under Section 5.0(B) of the Addendum merely because Western Express *tendered* delivery, arguing there is no authority for such a substitution of language in the contract. Menlo also rejects Western Express's assertion that the Sole Negligence Exception may apply, asserting that Western Express has cited no authority that companies have a duty to accept late deliveries. To the contrary, Menlo argues, the evidence establishes as a matter of law that the only negligence involved was that of Western Express's driver. On this question, Menlo asserts that the driver's statement to its investigator that he left the truck unlocked was a binding admission and further, that even if the truck was locked when it was stolen, leaving it running and unattended was, nonetheless, negligent as a matter of law.

With respect to the breach of contract claim based on the Indemnification Clause of the Master Agreement, Menlo asserts it is entitled to summary judgment because Western Express offers no defense except that the Master Agreement is not properly authenticated. Menlo argues that Western Express's challenge to the authenticity of the Master Agreement should be rejected, however, because it is based only on hearsay.

7

As to the insurance requirement contained in the Addendum, Menlo rejects Western Express's argument on waiver, pointing out that the only evidence offered in support of waiver was a statement in the Declaration of Clarence Easterday that certificates of insurance had been provided to Menlo. The certificates, however, only provide basic information concerning policy limits, types of coverage and expiration dates. *See* Supplemental Declaration of Amy L. Kashiwabara in Support of Plaintiff's Motion for Summary Judgment or Summary Adjudication ("Kashiwabara Supp. Decl."), Ex. C (Certificate of Liability Insurance dated 1/29/04). They do not include any specific terms of the policies listed. Therefore, Menlo asserts, they cannot give rise to any waiver. Menlo also argues that the waiver argument fails because the Master Agreement contains a provision precluding waiver on the basis of failure to enforce. *See* Schuler Decl., Ex. 1 at 13.

Regarding the negligence claim, Menlo does not agree with Western Express that Indiana law should be applied, arguing that the California choice of law provision in the Master Agreement governs not only the contract claim but also the negligence claim. Also, Menlo argues that no conflict of laws has been established that would justify applying the law of a state other than California.

Finally, Menlo rejects the assertion that it has provided inadequate support for the amount of damages sought, pointing out that it is undisputed that HP filed a claim for $336,932.02 and that Menlo paid the claim in full. Menlo rejects the contention that damages are governed by 49 U.S. § 14706 on the basis that in the Master Agreement, the parties waived "any and all rights and remedies that Carrier may have under Part B of Subtitle IV (49 U.S.C.A. § 13101 through 14914)." *See* Schuler Decl., Ex. 1 at 2.

### III. ANALYSIS

#### A. Legal Standard

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a summary judgment motion, then, the inquiry is whether, with respect to any dispositive issue, the pleadings and supporting materials show there is no genuine issue of material fact and, if not, whether viewing the evidence and inferences which may be drawn therefrom in a light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *See*

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). Thus, unauthenticated documents may not be considered on summary judgment. *Id*.

### B.  Admissibility of Master Agreement

Western Express contends there is a question of fact with respect to Menlo's contract claim to the extent it is based on the Master Agreement because the authenticity of that document is disputed. Having reviewed the evidence, the Court concludes that: 1) the Master Agreement has been adequately authenticated; and 2) there is no genuine issue of material fact on the question of whether the Master Agreement was executed by both parties, as the undisputed admissible evidence demonstrates that it was.

Pursuant to Rule 901 of the Federal Rules of Evidence, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Such a finding may be based on testimony of a person with knowledge. *See* Fed. R. Evid. 901(b)(1). Thus, "[a] document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so." *Orr*, 285 F.3d at 774 n. 8 (quoting 31 Wright & Gold, Federal Practice & Procedure: Evidence § 7106, 43 (2000)).

Here, Western Express questions the authenticity of the Master Agreement. Western Express points out that the Addendum refers to a Master Agreement dated May 8, 2002. According to a Western Express vice president, Clarence Easterday, Western Express does not have a copy of any May 8, 2002 Master Agreement and prior this litigation, also did not have a copy of the Master Agreement dated April 16, 1999 on which Menlo relies. Easterday Amended Declaration, ¶ 10. Easterday also states that "Western Express does not recognize the signature on behalf of Western Express on the last page of the document dated April 16, 1999 and does not know of anyone who might have signed on behalf of Western Express at that time." *Id*.

On the other hand, Menlo provides two declarations to authenticate the 1999 Master Agreement. First, Menlo offers a declaration by Joseph Schuler, and employee of CNF Employment Services, which provides cargo claims services to Menlo. *See* Schuler Decl., ¶ 1. According to Schuler, "[t]he 1999 Master Agreement and the HP Addendum are maintained by Menlo pursuant to its normal business

9

procedure for maintaining Menlo's contracts with carriers. Menlo and Western Express used the 1999 Master Agreement and the HP Addendum in the normal course of business between Menlo and Western Express." *Id*., ¶ 6. Second, Menlo provides a declaration by Menlo Employee Joseph Dagnese, who signed the Master Agreement on Menlo's behalf. *See* Declaration of Joseph Dagnese in Support of Plaintiff's Motion for Summary Judgment or Summary Adjudication ("Dagnese Decl."). Dagnese states that "[a]s part of my duties, on or about April 16, 1999, I signed the Master Broker / Motor Carrier Agreement (TL) between Menlo and Western Express." *Id*., ¶ 3. He states further that the copy of the Master Agreement attached to the Schuler Declaration is a true and correct copy. *Id*. Dagnese also explains that the reference to a May, 8, 2002 Master Agreement in the Addendum was an error, and that the correct Master Agreement is the one he signed in 1999.[6] *Id*., ¶ 4.

Menlo's evidence is sufficient to support a finding that the document is authentic. Nor does the evidence offered by Western Express persuade the Court that there is a fact question regarding the document's authenticity. First, the Court disregards Easterday's statement that Western Express does not recognize the signature on the Master Agreement and does not know who might have signed it because it is not supported by any facts indicating personal knowledge. Easterday does not state what records, if any, he reviewed and he himself testified in his deposition that he has been employed by Western Express only since April 2002. *See* Supplemental Declaration of Amy L. Kashiwabara in Support of Plaintiff's Motion For Summary Judgment or Summary Adjudication ("Kashiwabara Supp. Decl."), Ex. 1. This leaves only Easterday's testimony that Western Express did not have a copy of the 1999 Agreement in its files prior to the litigation. This statement is not compelling, given that Western Express has come forward with no other master agreement and that it does not dispute that it signed an *addendum* to a master agreement (making it highly probable that it signed a master agreement as well). Therefore, the Court concludes that the Master Agreement attached as Exhibit 1 to the Schuler Declaration is admissible. In addition, disregarding Easterday's statements that are not supported by personal knowledge, the Court concludes that the Master

---

[6] Menlo also asserts that the testimony of Clarence Easterday during his deposition that the document "appear[ed] to be the Menlo contract" constituted an admission of the authenticity of the 1999 Master Agreement. *See* Kashiwabara Decl., Ex. E. The Court disagrees. By using the word "appear," Easterday made clear that he did not purport to authenticate the document that he was viewing.

10

Agreement was executed by both Plaintiff and Defendant.

### C. Choice of Law

The parties agree that California law should be applied to Menlo's contract claims. However, they disagree on the applicable law as to the negligence claim. Menlo asserts that California law applies, based on the choice of law provision in the Master Agreement, while Western Express argues that the negligence claim is governed by Indiana law. Menlo is correct.

The Master Agreement provides that it is to be governed by California law. Schuler Decl., Ex. 1 at 11. Under California choice of law rules, contractual choice of law provisions are enforced unless "(1) the chosen state has no substantial relationship to the parties or transaction; or (2) such application would run contrary to a California public policy or evade a California statute." *General Sign Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995) (citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992)). California law construes choice of law provisions broadly. *Id*. As the California Supreme Court stated in *Nedlloyd*, "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." 3 Cal. 4th at 468.

In this case, neither of the exceptions listed above applies, supporting the enforcement of the choice of law provision in the Master Agreement. Moreover, the holding of *Nedlloyd* supports the application of California law to both the contract claim and the tort claim, given that they arise from or are closely related to the contract. This conclusion finds further support in the fact that the contract claim at issue here turns, in part, on a determination of whether the Sole Negligence Exception in Section 5.0(B) of the Master Agreement applies. The parties could not reasonably have expected their choice of law provision to have governed the Sole Negligence Exception under the contract but not a negligence claim involving essentially the same issues. Therefore, the Court applies California law to both claims.

### D. Contract Claim

#### 1. Loss of Goods Prior to Delivery

Menlo asserts that it is entitled to summary judgment on its breach of contract claim because the undisputed evidence shows that Western Express is obligated under Sections 5.0(B) and 6.0(B)(i) of the

11

Addendum and Section 6 of the Master Agreement to cover any losses that occur while the goods are in its possession and prior to delivery. In determining whether Menlo is correct, the Court must determine whether there is a factual dispute as to two key issues: 1) were the goods delivered to HP; and 2) was the loss due to the "sole negligence" of HP and/or Menlo?

### a. Delivery

With respect to the first question, the Court holds, as a matter of law, that the goods were not delivered to HP's Indianapolis facility. "In general, 'delivery occurs when one party surrenders--and the other party accepts--possession, custody, and control of the goods involved." *Electro Source, Inc. v. United Parcel Serv., Inc.*, 95 F.3d 837, 839 (9th Cir. 1996) (quotations omitted). "If the intent of the parties to the contract requires more, however, then delivery is not completed by a mere surrender and acceptance." *Id*. "Because delivery must mean delivery as required by the contract the intention of the parties defines its scope." *Id*. (quotations omitted).

Here, it is undisputed that HP did not accept the goods. Rather, it told the driver the delivery would have to be rescheduled. Nor is there any indication in the contract that the parties intended "delivery" to include arriving with a load and offering to unload it. To the contrary, Section 7.0(A)(iii) of the Addendum makes clear that delivery occurs only when a piece count has been confirmed by the consignee and driver. *See* Schuler Decl., Ex. 2 at 5. It is undisputed that that did not occur here. The fact that Section 5.0(B) uses the term "delivers" rather than the word "tender" further supports the Court's conclusion. *See* Schuler Decl., Ex. 2 at 2, Section 5.0(B) ("[c]arrier shall be liable to Menlo and HP . . . until carrier *delivers* such product") (emphasis added). In contrast, in a section of the Addendum addressing shipments that arrive on weekends and holidays, the word "tender" is used, indicating the parties understood there to be a distinction between delivery and tender of delivery. *See* Schuler Decl., Ex. 2 at 7, § 10(C)(i) ("[s]hipments tendered on a weekend or holiday or after 6:00 p.m. on a workday will be considered . . . as tendered on the next following work day").

Western Express's argument that Section 7.0(A)(iii) "has nothing to do with delivery" and is "merely a detail of a security procedure," makes no sense. *See* Oposition at 8-9. The only sensible reading of this section is that it was intended to ensure that goods were not lost prior to delivery. Further, Western Express's reliance on HP's practice of accepting late deliveries – assuming this evidence is

admissible – is unavailing. Even if this is true, it does not change the fact that HP *did not* accept the delivery in this case and did not go through the procedures set forth in the contract to accomplish delivery. As a result, Western Express is liable for the loss of the HP goods, as a matter of law, unless there is a material question of fact on the question of whether the Sole Negligence Exception applies.

### b.     Sole Negligence Exception

Under the Sole Negligence Exception contained in Section 5.0 of the Addendum, Western Express is not liable for the loss of the HP goods if it resulted from HP's "sole negligence." *See* Schuler Decl., Ex. 2 at 5. Menlo argues that this exception cannot apply for two reasons. First, it argues that HP cannot be "solely" negligent because Western Express is itself negligent, as a matter of law. Second, Menlo argues that in any event, there is no authority suggesting that merely by declining to accept a later delivery HP could have been negligent and therefore, as a matter of law, HP was not negligent. If Menlo is correct as to either point, it is entitled to summary judgment.

#### i.     Western Express's negligence

The parties agree that Western Express, at the time of the theft, was a bailee. *See Gerbert v. Yank*, 172 Cal. App. 3d 544, 550 (1985)(explaining that "'[i]n a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men'") (quoting *H.S. Crocker Co., Inc. v. McFaddin,* 148 Cal.App.2d 639, 643 (1957)). A bailee owes the bailor a duty of due care in the care and custody of the bailee's property. *Gardner v. Downtown Porsche Audia*, 180 Cal. App. 3d 713, 715 (1986). If the bailee does not redeliver the subject of the bailment, it is liable to the bailor for any damages suffered by the bailor unless the bailee can establish the absence of negligence. *Id*. "This is true even where a third person stole the subject of the bailment and thus made redelivery impossible." Id.

What constitutes due care is generally a question of fact to be decided by the jury. *See Smith v. Santa Rosa Police Dep't*, 97 Cal. App. 4th 546, 566 n. 13 (2002) (citing 6 Witkin, *Summary of California Law, Torts*, § 818, 170-171). However, "the proper conduct of a reasonable person in particular situations may become settled by judicial decision, or be prescribed by statute or ordinance, and conduct below this standard is negligence per se, or negligence as a matter of law." *Id*. Here, Menlo

asserts that it is negligence as a matter of law to leave a truck running, unattended and unlocked and moreover, that even if the truck was locked, it was negligence as a matter of law to leave it running and unattended. With respect to the former proposition, there are cases directly on point that support Menlo's position. With respect to the latter proposition, it is less clear that Menlo is correct.

In *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682 (1984), the owner of a tractor-trailer rig sued a truck stop that performed service on the rig and left it unlocked, unattended and with the keys in the ignition after the service was performed. The rig was stolen and wrecked and the owner sued for negligence. *Id*. at 684. The parties stipulated that at the time of the theft, the truck stop was a bailee. *Id*. The court held that the truck stop was negligent as a matter of law. *Id*. at 688 (holding that "[t]he leaving of the keys in the ignition of an unlocked and unattended vehicle parked on an outdoor lot at night is negligence as a matter of law . . . ."); *see also United Truck Rental Equip. Leasing, Inc. v. Kleenco Corp.*, 84 Hawai'i 86 (1996) (holding defendant was negligent where one of its employees left rental truck unlocked, with the key in the ignition).

On the other hand, where keys have been left in the ignition but a vehicle was secured in some way (for instance, in a locked garage), courts have often found that the question of due care is one of fact to be decided by the jury. For example, in *Fortner v. Carnes*, 258 S.C. 455 (1972), the owner of an automobile sued the auto repair shop for negligence where the keys were left in the ignition but the automobile was inside a locked garage. A thief broke in and stole the car. *Id*. at 457-458. A jury found in favor of the car owner. *Id*. at 457. The court of appeals denied the auto repair shop's motion to overturn the verdict. *Id*. at 462. However, the court made clear that the question of whether due care had been exercised was properly decided by the jury rather than the court. *Id*. at 461; *see also* 43 A.L.R. 2d 403 § 12(b) (listing cases in which courts found a fact question or no negligence where automobile was inside locked building, even where keys were left in ignition).

The Court concludes that Menlo is only entitled to summary judgment on the issue of Western Express's negligence if it is undisputed that the truck was left unlocked. The Court concludes that it is not undisputed. Menlo asserts that even though Douglas has submitted a declaration stating that he believes he locked his truck, that declaration should be disregarded because Douglas previously told Menlo's investigator, Chris Zook, that he had left the truck unlocked. *See* Declaration of Jerrick Douglas in Support

14

of Opposition to Plaintiff's Motion for Summary Judgment ("Douglas Decl."), ¶ 6; *see also* Zook Decl., ¶ 12. According to Menlo, this statement constitutes a binding admission on Western Express. However, Menlo presents no authority that suggests a statement made to a party's investigator by an employee of a defendant rises to the level of a binding admission. While it is true that a party may not create a factual dispute by submitting a declaration that conflicts with earlier deposition testimony or other sworn testimony, *see Sinai v. Bureau of Auto. Repair*, 1993 WL 341276, *4 (N.D.Cal.), Douglas has not been deposed and has filed no other sworn statement with the Court. Therefore, the Court concludes there is a material issue of fact as to whether the truck was locked and accordingly, a fact dispute as to whether Western Express exercised due care.

### ii. HP's negligence

Menlo argues, in the alternative, that it is entitled to summary judgment on its breach of contract claim because, as a matter of law, HP *was not* negligent and therefore, the Sole Negligence Exception does not apply. Western Express, on the other hand, argues there is a fact question on this issue, citing evidence that HP employees told the driver that he could not unload the truck until Monday and that he could not leave his truck at the HP facility, even though the HP facility had, in the past, accepted odd-hour deliveries. According to Western Express, a jury could reasonably conclude based on this evidence that HP did not exercise due care. In support of this position, Western Express cites a decision by this Court in another case in which a fact question was found regarding the "Sole Negligence Exception" in a similar contract where Menlo did not warn the carrier that a load was "high risk" and the load was later stolen. *See* Opposition, Ex. A (Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment, Case No. C-03-2560 JSW, filed 5/2/05).

Western Express has presented evidence that the driver was not permitted to remain at the HP facility over the weekend, that the facility had accepted late loads before, and that there was a history of theft of high-value loads associated with the facility. While the evidence on this issue may not be compelling, the Court cannot say, as a matter of law, that HP could not have been negligent. As noted above, the question of due care is generally a fact question for the jury. Menlo has not cited any cases suggesting that under the circumstances here HP could not have been negligent. Therefore, the Court concludes that a material issue of fact precludes summary judgment on the question of HP's negligence.

### 2. Indemnification Clause

Menlo asserts that it is entitled to summary judgment on the basis of Section 16 of the Master Agreement, governing indemnification. Although the only ground asserted by Western Express in opposition to Menlo's indemnification claim is its challenge to the authenticity of the 1999 Master Agreement, which the Court has rejected, the Court nonetheless finds that Menlo is not entitled to summary judgment on this claim.

"The question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control." *Centex Golden Constr. Co. v. Dale Tile Co.*, 78 Cal. App. 4th 992, 996 (2000). Generally, where the indemnification clause covers losses that "arise out of" the indemnitor's services, courts have interpreted the provision broadly to cover even losses that result in whole or in part from the indemnitee's negligence or wrongdoing. *See St. Paul Mercury Ins. Co. v. Frontier Pac. Ins. Co.*, 111 Cal. App. 4th 1234, 1243 (2003). Here, however, the Court concludes that the Indemnification Clause must be read in conjunction with the Sole Negligence Exception contained in Section 5(B) of the Addendum. That provision makes clear that the parties did not intend that Western Express would be subject to indemnification where the claim arises from HP or Menlo's sole negligence. Therefore, although the Court holds, as a matter of law, that HP's claim arose out of Western's services under the Master Agreement, and that Western did not "protect, defend, hold harmless and indemnify" Menlo, there remains a fact question as to whether the Indemnification Clause was breached because the facts regarding the applicability of the Sole Negligence Exception are disputed.

### 3. Insurance Requirement

Menlo asserts it is entitled to summary judgment on the contract claim on the additional ground that Western Express failed to obtain the sort of insurance it was contractually obligated to maintain under Paragraph 5 of the Master Agreement. Western Express does not dispute that it's insurance coverage did not comply with this provision. Rather, it asserts that the claim is waived because Western Express had provided its certificates of insurance to Menlo and Menlo had not objected. Further, Western Express cites to Easterday's sworn declaration stating that "to the best of his knowledge," insurance containing such a provision is unavailable.

The Court rejects Western Express's waiver argument. The Master Agreement expressly provides that it may not be modified "in any manner except by an instrument in writing" and that "failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver . . . ." Schuler Decl., Ex. 1 at 13. Therefore, even if Western Express did disclose that it did not have the appropriate insurance coverage – a question the Court need not reach – Menlo's failure to enforce did not give rise to a waiver as a matter of law.

On the other hand, there is a fact question regarding Western Express's impossibility defense. Although Easterday offers few specific facts in support of his statement that the required insurance is not available, he states that he is "familiar with insurance available to carriers on cargo policies." Easterday Amended Decl., ¶ 12. While hardly compelling, the Court concludes this evidence is admissible and sufficient to create a fact question on this issue.

### E. Negligence Claim

Menlo argues that it is entitled to summary judgment on its negligence claim for the same reasons it argues Western Express was negligent as a matter of law for the purposes of determining whether the Sole Negligence Exception to its contract claim applies. For the reasons discussed above, the Court concludes that an issue of fact remains as to this claim.[7]

## IV. CONCLUSION

For the reasons stated above, Menlo's Motion is DENIED.

IT IS SO ORDERED.

Dated: September 23, 2005

JOSEPH C. SPERO
United States Magistrate Judge

---

[7] Because there is a question of fact as to Western Express's negligence, the Court need not reach the question of whether there should be an apportionment of liability.

17